Thank you, Council. That brings us to Glasscox v. Argo. We'll just wait until the courtroom clears out, and then we can make sure that you have our full attention. Whenever you're ready, Council. Good morning. Good morning, Court. My name is Tom Hale. I'm from Birmingham, and I have the privilege of representing Officer David Moses in the little town of Argo over in Alabama. This case presents a very unique circumstance, as far as I can see, from case law precedent and from other jurisdictions that we've looked at, where on an initial 12B6 motion, we had the opportunity to present a video of the very incident made the basis of this suit. This incident shows the exact kind of realities that police officers find themselves in every day and how many times it's unimaginable. I found a comment from Judge Edmondson from a case back in 2008 that we cited to the court, Buckley v. Haddock, where it says, the circumstances that call on police to use some intermediate force between no force and deadly force remain the cases where the law of excessive force is most ambiguous. It will probably always be so, considering the limitless sets of potential different fact combinations and the necessity of allowing for flexible responses from the police. Indeed, in a case that I will submit to the court under electronic filing, Judge Dabena back in 1994, whose dissent in the first case caused the majority to overrule itself and was the majority opinion, stated, police on the beat are exposed in the service of society to all the risks which the constant effort to prevent crime and apprehend criminals entails. Because these people are literally the foot soldiers of society's defense of ordered liberty, the state has an especial interest in their protection, and he was quoting Justice Rehnquist's dissent in Roberts v. Louisiana. Sir, I don't have a, I'm speaking only for myself. I don't think I have a problem with the first tase. I think the second through fourth tases are a little bit trickier. If you could maybe help me out by directing your argument to why the second through fourth tases were reasonable under the circumstances. Precisely the question, Judge. When this officer, it picks up this driver, and it follows him as the video shows, and I believe we've provided the court to a slow motion video so you could look at it in hyper time, based on what he is seeing, and when, contrary to what my appellate counsel says, he stopped his car, he lost control of it, and he stopped perilously close to the median of oncoming traffic and rush hour traffic, and when Officer Moses gets to that door, and he pulls it open, he has both of his weapons drawn, because he has absolutely no idea who he's encountering. He has zero information about him, even though he had finally gotten close enough to finally dial in the tag to give it to dispatch, they gave him no information, and the only thing he sees is a white male who's still buckled. He's got both of his feet in the driving position over the pedals. He doesn't know his name. He doesn't know whether he's fleeing from an armed robbery. He doesn't know whether he's intoxicated. He doesn't know any of these things about him. In the video, it does look like the car is off. Am I mistaken about that? Well, there's a question about that, because as you all pointed out in Davidson v. Opelika, when the car came to a stop, you saw the lights flicker, indicating it had gone into park. That's not on the video, but what is in the video- So there might be an issue of fact about whether it was on or off. Well, if there is, I don't think it's material, because at this point, when the officer encounters this guy, he's still buckled, and he has apparent control of the car. He puts the officer immediately back to the traffic that's whizzing by that you can see repeatedly. And after the command, show me your hands, get out of the car, get out of the car, he doesn't do it. Now, granted, all this happens in 58 seconds. And I agree. The first tase, the reason I don't have an issue with the first tase is because his hand disappears in the video, and the officer certainly could have been exposed to serious danger. I'm not sure where I come down on two through four, which is why I'm asking you if you could focus a little bit on those. Well, two through four, and not only has the threat not ceased, according to the district court, or at least diminished, I put to the court, it has escalated. Because of the danger to the officer, he doesn't know, to the driver himself, and obviously to potential passing motors, because until he gets him out of the car and in custody, there is that huge danger that this guy, once he gets out, he's going to rush him. He's already shown his aggression by taking that seatbelt off and throwing it behind him. And you have to look at it through the eyes of this officer. And as I say, the threat escalates at that point. Well, Mr. Glasscox contends that he was unable to comply because of the repeated tasing, and that the motions of his hands and so forth were caused by the tasing. And I don't know that the video refutes that. Well, Your Honor, I think that there is evidence that, as Officer Moses said in his criminal trial, I believe you've got a copy of the transcript, he was retrained on taser May 31st before this incident happened in July. And he said, what happens? Are these not the kind of reactions that you get when you're getting tased? His answer was, no, the reaction you usually get is they comply. And that didn't happen. Now, what is more important, too, unlike Forino, Oliver Forino, and the Wake versus Kubler case, where you've got multiple applications, where the suspect is obviously incapacitated. He's obviously unable to control his body and exhibiting all these other factors that you would expect from tasing, lying on the floor, lying on hot asphalt. Here, after four taser applications, even when Mr. Glasscox gets up, the threat hadn't ended. He is right there and can still, and I submit that if Officer had tased him again, if he had made a lunge at him, that would have been constitutional. And these are the decisions that they have to make. He had both his deadly force and his taser, and he elected for the less of the two. And in order to get control and custody of this person and to move out of that zone of danger that affects all these other people coming, that's the decision that officers make. If they're mistaken, they're mistaken. But that's where the discretion has to come in for him to gain control and eliminate this threat. And until he gets him back to the back of the car, Mr. Glasscox walks just fine. He, in fact, walks backwards. He's able to submit his hands. He kneels. He gets back up. And he also answers the questions that Officer Moses asked him very clearly and very correctly. Now, if the concern for the officer was to get off the highway, it seems to me the officer would have to give Mr. Glasscox time to comply and get out of the car. And one of the tasings is like two seconds right after the other one. And I'm not sure that the video tells us that he had time to comply. Well, that may be a question of fact. I submit to you that after he slams off his seatbelt, that is a very critical moment when he has showed his disgust and his agitation. And then all bets are off. And I say that's when it goes up from just a compliance to a custody issue. Because anybody can interpret that as an act of certain agitation and probable aggression. And that's what these officers are trained to observe. As you note in his comment in the court that he didn't smell an odor of alcohol about him. And when he finally got him out and looked at him, his eyes weren't pinpoint. But it is a very dangerous setting that they are in until he has custody of him. And he has custody of him out of this zone. That's what these guys have to face and make those decisions every day. And in looking in hindsight, it's easy kind of to say, well, you know, that was a little too quick, too fast. But in the realities of it, in that pinpoint split second, he has to make the decision with all these other things that are going on around him to eliminate the threat to himself, to Mr. Glasscox, and certainly any potential innocent motorist that he would get tackled and pushed straight into traffic. That's what these guys have to think about. And they're not perfect. They're not legally trained on every nuance of it. And that's why looking at these in the eyes of someone who is in that spot, what would you do? You just have to—I think the statement about having to look through the eyes of an objectively reasonable officer and not in the cool, calm, reflective hindsight of the court chambers, you really have to think about what you as a person would be doing if you're in that situation. And that's what these officers are faced with every day. Now, the point here, too, that since this is video, Officer Moses was wearing his own personal video. He didn't have to do that. He was doing that to protect himself in the event something just like this happened. Thank you, counsel. Okay, thank you. And you've reserved five minutes for rebuttal. Morning, Your Honor. I'm Greg Yagma. May it please the Court, I'm here on behalf of Mr. Glass-Cox. What my co-counsel here, excuse me, colleague here has impassioned these factual disputes. And it's exactly what the district court cited when they denied summary judgment on qualified immunity, because all of these raise jury questions. And I think what we really have in this particular case is we really have a scene one and a scene two. Scene one being the erratic driving by Mr. Glass-Cox. Scene two being when the vehicle is stopped, turned off, and he first encounters Officer Moses. And the time frame is crucial in this case as compared to the other 11th Circuit cases that have denied qualified immunity. It was three minutes and 33 seconds from the time that Officer Moses activated his lights and sirens and Mr. Glass-Cox was in custody. It was two minutes and 16 seconds from the time that Officer Moses activated his lights and sirens and Mr. Glass-Cox had pulled the vehicle over and stopped it and Officer Moses was running to the vehicle. And it was exactly 58 seconds from the time frame that Mr. Glass-Cox had any interaction with Officer Moses. And in that 58 seconds, 20 of them he spent being tased, which is roughly 34 percent. And as the case law in the 11th Circuit has recognized and even Officer Moses has recognized that you typically do not have control over your body during these tasings. This is a 69-year-old frail man who weighed about 140 pounds where you've got a large trained in the martial arts who has both of his weapons pulled, a firearm and a taser. And granted, we haven't been able to do any discovery in this case about what policies and when you start with that. But you've got somebody with Mr. Glass-Cox raising his hands up saying, I'm sorry, I'm sorry. That is the first interaction. And you look at the time frames. So within these 58 seconds from the time the door is opened until the time Mr. Glass-Cox is tased the first time is 16 seconds. There are no warnings. There are only unbuckle your seatbelt, which he did. There are get out of the vehicle. And he says, I'm trying. Well, on the first the first tase, the officer did say, don't you reach? And then your client, it looks like may have reached. I'm sure he didn't mean to do it for that reason. But when we look at it from the standpoint of a reasonable officer. With all due respect, Judge Rosenbaum, I would disagree on this part. If you actually freeze the video from the exact same where he's actually getting tased, right, as you can see the taser wires, you can see both of his hands. And I think that's a factual dispute. You can actually see both of his hands. But as they did in Oliver conceding that the first tase was justified, which we would say it's not because we think it's a factual dispute. We still have two through four. Right. We've still got two through four. And he's get tased in the chest. Officer Moses acknowledged in his municipal court testimony, I've been tased twice. Once in a controlled environment, which is required to be certified. And it's one five second ride when you know it's going to happen. You know when it's going to happen and you know it's going to be over with. And he said, I lost some control of my body. The second time he was tased, he was actually out in the field somewhere, he said. And somebody tased him and he lost complete control of his body. By complete control, you don't have the ability to resist arrest as one of the Graham factors. Are you resisting arrest? You don't have the physical capability to resist arrest, even if you wanted to. The video is clear. He is simply trying to remove these taser wires from his chest. That's not legally resisting arrest. That's not resisting arrest in the Graham. Well, why couldn't the officer, a reasonable officer, have perceived that that's what he's doing if he's trying to remove the prongs from his body? Right. An officer who's been trained, who's been through tasing, a reasonable officer will think it's somebody just like putting their hand on a stove. They're getting hit in the chest, which Officer Moses testified you're instructed to not do it, to avoid it at all costs, to not hit somebody right in the chest where the electrodes. But he's pulling these wires off of his chest. I mean, right in front of him as his body is convulsing and his back is arching. I think any objective officer would recognize, having been through it, that's exactly what he's doing. He's just trying to stop the pain. Because then when you have that five seconds of writhing, you don't have the ability to get out of the vehicle. He couldn't have been a 19-year-old college athlete and had wires in his chest and had the ability to get out of the vehicle immediately. And that's why the time frame is so important, Judge Pryor, because then the second tase is four seconds later. You've been tased once as a 69-year-old frail man. You don't have the ability to do anything as a factual dispute. And that's part of the reason that the district court said there were so many unanswered questions. Well, let's say we agree with you that there are fact questions here. Okay. Talk about clearly established law. Well, we would say this, Judge. We would say, clearly, this argument has been waived. And this is the reason why. We filed a complaint. They filed the motion to dismiss. And in that motion to dismiss, they simply state that in the analysis, they state, since the Fourth Amendment contains a right to be free from excessive force, the analysis in this case turns on whether or not Officer Moses' conduct violated Glasscock's right to be free from excessive force. It says nothing about a clearly established right. And it goes on to do the analysis of the Objectable Reasonable Standard and also the state law claims. We file a first amended complaint, which is the governing complaint here. They file almost the exact same brief. When they go through the analysis, they use the exact same quote, since the Fourth Amendment contains a right to be free from excessive force, the analysis in this case turns on whether or not Officer Moses' conduct violated Glasscock's right to be free from excessive force. And then it goes on to do the analysis of Objectable Reasonable Standard and the case law that we're the Graham and the Oliver in those cases. And it goes on to the state claim. And that's it. We file a response to it. And in fact, in the response, we raise the fact that they've waived the argument. They haven't even mentioned this argument about clearly established right. They file a reply to that. Again, no mention whatsoever about clearly established right. And in Judge Baldry, the district court judge's order, she even puts that in a footnote. It says they have waived the right. But then she goes on to the analysis. So we say the first argument is they've absolutely waived it. They've had this case since the beginning. They've been through three or four pleadings. And they've never raised it until we got here in the 11th Circuit. The Judge Baldry did go through an analysis. The second is, you know, the clearly established right. She said that the Oliver case put them on fair and adequate notice about the repetition of the tasings. There you had eight tasings in approximately two minutes. You have here four tasings in 58 seconds. And at first, Officer Moses actually thought he tased him five times. But you have four tases there. And I think that Oliver puts them on fair and adequate notice with regards to the tasings. And if you go back to the other cases— No, well, in Oliver—go ahead, Judge Riffle. No, please, go ahead. In Oliver, the suspect hadn't committed any crime and was largely compliant the whole time. I think that's a little bit different. It's a little bit different except for this, I would agree, except for a couple of things. I think it's important for scene one and scene two. And right before we came up here, opposing counsel handed me a case I had never heard of, and it wasn't in his brief, and I sort of glanced at it. And in fact, it sort of helps me out in this respect. It's Davidson v. City of Opelika where there was erratic driving. And they said that counsels towards—and granted, this is a 2017 case—but it counsels that erratic driving alone is not some dangerous crime that would counsel towards it in the Graham analysis. But as far as the clearly established right, and I think Oliver is different, but Oliver actually physically was on the street, and he pulled away from the officer. And that's why they said that the first haze may have been justified, that he actually had—there was the ability for him to pull away. It's also important to understand that Mr. Glass-Cox is in a confined space. There's nowhere for him to go. There's nowhere for him to pull away. There's nowhere for him to flee. So when you have the Oliver analysis on clearly established right, I think it counsels towards putting them on fair and adequate notice with regards to the number of hazes. You also have the weight case, which, interestingly enough, Barnes, who was the decedent in that case, was 5'11", 290 pounds, got in a physical fight, an actual fight with somebody with that officer before the second officer, Coober, arrived. And the court went through the analysis of the time frame that the tasings began, and it looked to the number of repetitions of tasings. They were having problems handcuffing this man, Barnes. I mean, they had bystanders trying to help him handcuff him. And they looked towards five tasings in two and a half minutes, which they went through the time frame of them, and the time frames of them were a lot different, a lot more spaced out than what you have in this particular situation. You had the tasings of nine seconds, 28 seconds, 18 seconds, and 30-second intervals. So one of the tasers here involved direct contact of the appliance with the man's leg. Am I correct that that creates a more severe shot than these? I believe that's correct, Your Honor, but I'm not sure if there's been medical testimony in the record. Again, we haven't had a chance to develop the record with regard to any, but I believe that's correct. That's the design of it, is the electrodes, the wires can shoot, I think the case law says 21 feet and hit the electrodes, but the shot to put it on his leg would be more severe. Yes, Judge Ripple, I would agree with that. Now, the Waite case was decided after this incident, but I believe that Waite concluded that the law was clearly established at that time based on Oliver. Is that right? That's correct, Your Honor. The other way to establish clearly established law is that it's so obvious, and that's what Oliver recognized, if the conduct was so obvious that a reasonable officer should have knowledge that this would be a federal violation. We would also argue that, again, based on what we've talked about, scene one and scene two, and the repetition, and the height, and the weight discrepancy, the fact that after tase one, you can debate the tase one, but the video, you can see his hands the entire time, and Officer Moses testified to that. He never lost sight of his hands after tase one. And so I think that from a clearly obvious standard that was cited in Oliver, that it was clearly obvious that, you know, you have some violation of a constitutional right. If you continually tase somebody when they're unarmed, you can see their hands, and in this context, they're confined in a place where they can't go anywhere. The third argument I would make about clearly established, other than the waiver and the argument was, it's designed to put an objective officer on notice, or to put the officer on notice that this might be a violation. Officer Moses testified in the municipal trial himself that he himself knew that, that once a threat was over with, that you had no longer the right to inflict tasing on somebody to try to effectuate an arrest. So in addition to the waiver, and Oliver, and it being obvious, I think, you know, Officer Moses, I understand it's an objective officer standard, but when you're talking about notice and putting somebody on notice, he had actual notice that you, it could be argued that he had actual notice that you cannot continue to tase somebody when the threat is over with. I need help with sort of a housekeeping matter. The city is also an appellant here. The city, but they didn't raise, they didn't raise any issues before the court. I think their only issue was if there's qualified immunity for Officer Moses, then the city can't be liable. They have not raised anything on the 11th Circuit about Monell or anything. Well, but that's not right. I mean, if there's a constitutional violation, the city can be liable, right? Right. I agree, but they haven't raised, as far as the purposes of this argument from a housekeeping, I think the only thing before the court is whether Officer Moses, there was error in denying him qualified immunity. Okay. So if we find there's a constitutional violation, then the district court properly denied summary judgment to the city. Correct. Correct. Can you tell me the status of Mr. Glax-Cox's appeal of his criminal case? The criminal case is appealed de novo, and it's just pending in Jefferson County Circuit Court where the case has sort of just been languishing. I guess, you know, it has a parallel case here. It's been, you know, there, and I mean, we're ready to try that. We're prepared to try that case also, you know, which was interesting in this particular case that we talked about. I know we're talking about an objective, reasonable standard, you know, but we have the affidavit of the longtime Dr. Ovale of what actually happened here is, you know, there's no drugs, no alcohol. He received treatment in the, you know, I know they raised in the brief that the injuries that he had, he actually had physical injuries and psychological injuries, which is an unchallenged affidavit from Dr. Ovale. But I would also say that Oliver cited that part of the purpose of tasing somebody is to give them the opportunity to take them into custody. And I believe the quote was that it gives the officer a window of opportunity to effectuate the arrest. And if that's true, it gives you a five-second window to effectuate arrest or right thereafter. How could Mr. Glasscox be asked to comply with orders when he only had two seconds or he only had four seconds to comply with any particular orders? That's why the time frame in this is so important. The only person that escalated this situation was Officer Moses. He came up there, you know, lift your effing hands up or get your effing hands out and the hands are up. And the escalation occurred there from Officer Moses without giving him the chance to comply. Again, some of these cases that were cited usually has a big crowd and there's chaos going on. We've got one single person who says, I'm sorry. At some point, he says, I will, I will. At some point, he says, if you'll just give me the chance, I will. He even recognizes that I can't do this. He's just getting tased over and over and over. And I think it is a factual dispute for a jury to decide that it was objectively unreasonable and a clearly established right. I think they've just waived it. And even if they haven't, there's enough evidence in the record at this point and based on the case law to affirm the district court. Thank you. May it please the court, my name is Richard Whittaker. I also serve as counsel for the appellant, Officer David Moses. Just a few quick points in rebuttal. I'd first like to start with going back to some of the questions that the panel posed at the outset, expressing their concern less about tasing number one and more about tasings two through four. And the plaintiff, I think this sort of goes hand in hand, tried to separate the incident into two scenes or two acts. You know, scene one was the pursuit. Scene two is the incident that occurred on the side of the road. I think that that just ignores the reality. A police officer cannot divorce certain acts from others when they happen in the continuum. You cannot divorce the pursuit from Officer Moses' mind and then go view the traffic stop as if it were a routine traffic stop. He's pulling somebody over, you know, for a busted taillight or running a red light. That was not the case here. It would also take some exception to, you know, describing the driving as erratic. Speeding down an interstate, ignoring the lights and sirens of a police officer while reaching speeds in excess of 100, potentially 115 miles an hour is not erratic. And he was charged and convicted of reckless driving, reckless endangerment, and resisting arrest. And according to Alabama state law, that is prima facie evidence of probable cause for those arrests. So when Officer Moses goes to the car, he's not forgotten the pursuit and the nature of it. So when he tases the first time on the command of don't reach, yes, it is true that the second tase comes quite quickly. But as he testified in the municipal court trial, tasing number two is based upon Mr. Glasscox attempting to remove the taser probes from his chest. You can see that he has the fine motor control to reach and grab the wires and try to remove the taser probes. And when somebody is tased and they remove the taser probes, then the point of the tasing and the officer's attempt to control is mooted. If the probes are not connecting, then the taser is ineffective. So Officer Moses, in attempting to maintain control of what, in his eyes, and I think any reasonable police officer's eyes, is still a dangerous, somewhat unknown situation, does the second tase to prevent the removal of the taser probes and keep in place his ability to use the taser to affect custody and control of Mr. Glasscox. Now the third tase, we can see that Officer Moses reaches in with the command again to get out of the car. He attempts to pull Mr. Glasscox out of the car using his hand. We see clearly on the video that Mr. Glasscox pulls his hand back, continues to use curse words at Officer Moses. At one point we see a swipe and a hand moving to knock or move the taser out of the way. Then when the contact tase happens on the leg, he reaches to try to pull the taser off the leg. And Mr. Glasscox submits that those are natural. But I mean, honestly, who wouldn't try to push the taser out of the way when they're being tased, if they could do it? Well, some people might. I can see that's a possibility. I mean, really, who wouldn't? I don't know who wouldn't. Officer Moses testified clearly that in his experience, people usually comply with tasers, that an after action is not to continue some level of resistance, but rather to comply. And we don't see Officer, I mean, Mr. Glasscox begin to physically move out of the car until after the fourth tase. And again, I don't think there's much question these tases came in relatively quick succession. I think the video is clear about that. But I think what the video is equally clear about is the situation itself. Unfortunately, Mr. Glasscox didn't pull off the road into the parking lot of some store somewhere way out of the way. His car was pointed into oncoming traffic. And while the court brought this up, perhaps his car was in park. I don't think there's evidence before the court one way or the other. We don't see the car roll down. Just from looking at the video. When he gets out of the car and nobody goes back to the car to make sure it's turned off or anything of that nature, there's no indication it's still in gear. And it doesn't sound like it's on. It may not have been. I don't think that fact has been firmly established whether it was or wasn't. But as long as he maintains his position in that car, even if it's in park, even if it was turned off, it doesn't take long to turn a car on, slam it and drive, and continue the pursuit. Because I don't think, unlike what Mr. Glasscox has said, that he voluntarily stopped his car. I think it was a loss of control. And his car's pointing into oncoming lane of traffic following a multi-mile pursuit reaching rather excessive and dangerous speeds. I mean, there's no question he attempted to get away from the police officer in the eyes of a regional police officer. I think that it was reasonable to believe that in that moment that with the pulling of the taser probes out, with the swiping at the taser, that this was not somebody who was immediately going to comply. And the 11th Circuit has a fair amount of cases about tasings. And there are some general rules that we sort of see when looking at the gram factors. If the threat is minor, there's no resistance, excuse me, the crime is minor, there's no threat, and there's compliance. Generally, this Court has said that tasing after that point can be considered excessive. But conversely, where there is a threat, where there is resistance, where there is an attempt to evade, then this Court has generally found that the use of force is acceptable. And I think it is important to note that the moment that Officer Glasscox gets out of the car, the moment he moves his legs and he steps out, the use of force stops immediately. Thank you, Counsel. Thank you.